UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

               Plaintiff,

          v.

DONNA BOON,

               Defendant.

_____

DECISION & ORDER and
REPORT & RECOMMENDATION

11-CR-6083CJS

## PRELIMINARY STATEMENT

By Order of Hon. Charles J. Siragusa, United States District Judge, dated May 2,

2011, all pretrial matters in the above captioned case have been referred to this Court pursuant to

28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 2).

Defendant Donna Boon ("Boon") has been charged in two counts of a seven-count

superseding indictment returned against her and co-defendants Robert W. Moran, Jr. ("Moran"),

James Henry McAuley, Jr. ("McAuley"), Gina Tata ("Tata"), Richard E. Riedman ("Riedman"),

Timothy M. Stone ("Stone"), Richard W. Mar ("Mar"), Gordon L. Montgomery

("Montgomery"), Jeffrey A. Tyler ("Tyler") and Paul S. Griffin[1] ("Griffin"). (Docket # 126).

The first count of the superseding indictment charges McAuley, Mar, Boon, Riedman,

Montgomery, Tyler and Griffin with conspiring between the years 2002 and 2010 to possess with

intent to distribute and to distribute methamphetamine, in violation of 21 U.S.C. § 846.[2] (*Id.* at

_____

[1] Griffin pled guilty to the charge against him and was sentenced on March 25, 2013. (Docket # 392).

[2] A full recitation of the charges in the superseding indictment may be found in this Court's Report and
Recommendation dated November 26, 2013. (Docket # 441).

2).  The second count charges Boon with possessing with intent to distribute and distributing

methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2.  (*Id.*

at 3).

Currently pending before this Court is Boon's motion for a bill of particulars.

(Docket # 277 at ¶¶ 101-02).  Before the Court for Report and Recommendation are Boon's

motions to suppress evidence obtained pursuant to wiretaps, to suppress tangible evidence, and to

suppress statements.[3]  (*Id.* at ¶¶ 27-30, 31-61, 62-80, 86-88).  For the reasons discussed below, I

deny without prejudice Boon's request for a bill of particulars and recommend that the district

court deny Boon's motions to suppress wiretap evidence, statements, and tangible evidence.


## FACTUAL BACKGROUND

### I.  Wiretap Applications

On April 22, 2010, United States District Judge David G. Larimer signed an

eavesdropping warrant to intercept electronic communications over a mobile telephone assigned

number (585) 590-2228 (the "target number").  Mark R. Schirching ("Schirching"), an agent

employed by the Federal Bureau of Investigation ("FBI"), submitted an affidavit in support of his

---

[3]  Boon's omnibus motion also sought, *inter alia*, *Brady* material, a conspiracy hearing, disclosure of witness lists, discovery and inspection, a *Franks* hearing, identification of informants, severance, striking of surplusage, suppression of jailhouse recordings, a Rule 12(b)(4) notice, transcription of grand jury testimony, a ruling limiting admission of co-conspirator statements, a *Bruton* reservation, leave to file additional motions, and an extension of time *nunc pro tunc*.  (Docket # 277).  On December 12, 2012, Boon filed an additional motion claiming misjoinder.  (Docket # 337).

In her post-hearing submission, Boon seeks to withdraw her motion seeking suppression of the jailhouse recordings.  (Docket # 367 at 1-2).  This Court hereby grants Boon's request to withdraw that motion.

On November 26, 2013, this Court recommended that the district court deny Boon's motion claiming misjoinder or seeking severance.  (Docket # 441).  Each of Boon's remaining requests were either resolved by the parties or decided in open court by the undersigned on October 25, 2012.  (Docket ## 308, 310).

application for the warrant. ("Schirching Aff. 1"). On May 21, 2010 and June 18, 2010, Judge Larimer signed additional eavesdropping warrants authorizing the continued interception of electronic communications over the target number. Schirching submitted affidavits in support of his applications for those warrants (respectively, "Schirching Aff. 2" and "Schirching Aff. 3"). The following is a summary of the relevant facts set forth in each of Schirching's affidavits.[4]

### A. April 22, 2010 Wiretap

According to Schirching, since early 2006 the FBI had been conducting an investigation into the criminal activities of the members and associates of certain outlaw motorcycle organizations in the Western New York area, including the Hell's Angel's Motorcycle Club, Rochester Charter ("Hell's Angels") and the Road Agents Motorcycle Club ("RAMC"). (Schirching Aff. 1 at ¶ 11). Several other agencies also participated in the investigation, including the Drug Enforcement Administration ("DEA"); the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"); the New York State Police ("NYSP"); the Genesee County Drug Task Force ("GCDTF") – a local task force comprised of officers and investigators from the Genesee County Sheriff's Office, the Batavia Police Department and the LeRoy Police Department; and, the Genesee County Sheriff's Office (collectively, the "task force"). (*Id.* at ¶¶ 5, 11).

---

[4] Each of the three affidavits contains hundreds of allegations concerning the evidence gathered during the ongoing investigation. Boon challenges the wiretaps only on the grounds that they were unnecessary, not on the grounds that the warrants lacked probable cause. (Docket # 277 at ¶¶ 62-80). By contrast, Boon does challenge the search warrant issued for her residence on the grounds that it was not supported by probable cause. (*Id.* at ¶¶ 31-61). Because the evidence supporting that search warrant included information provided in support of the wiretap applications, the factual recitation of information contained in the wiretap applications is limited to the information relevant to the analysis of the sufficiency of the probable cause supporting the search warrant application for Boon's residence.

According to Schirching, the investigation yielded probable cause to believe that an individual named Donald G. Vanelli, II ("Vanelli"), who was allegedly a member and president of the RAMC, and others were involved in the trafficking of methamphetamine and the possession of firearms in furtherance of the trafficking activities. (*Id.* at ¶¶ 9(a), 11). According to Schirching, the purpose of the wiretap was to gather evidence needed to prosecute Vanelli and the other suspected participants in the drug trafficking network. (*Id.* at ¶ 94). In addition, the purpose also included discovering the identity of any unknown participants and customers of the drug trafficking network, identifying the sources of the methamphetamine, identifying the facilities used to store the methamphetamine, and identifying the anticipated timing and location of drug trafficking activities. (*Id.*). According to Schirching, the objectives of the investigation were not limited to prosecuting the known participants, but also extended to obtaining the information needed "to completely dismantle this drug distribution network." (*Id.*).

According to Schirching, the target number was assigned to a mobile phone subscribed to by Vanelli's girlfriend, Nicole L. Primus ("Primus"), and used by Vanelli in connection with the methamphetamine trafficking activities. (*Id.* at ¶¶ 3, 12). Schirching outlined in considerable detail the evidence collected pursuant to traditional investigative techniques that he believed established probable cause to conclude that the communications to be intercepted from the target number would reveal evidence of drug trafficking activities. (*Id.* at ¶¶ 11-93). Specifically, Schirching described information obtained from a reliable source ("RS") and six confidential sources[5] ("CS-1," "CS-2," "CS-3," "CS-4," "CS-5" and "CS-6"). (*Id.* at

_____

[5] Schirching's affidavit also recounted information provided by an additional confidential source identified as "CS-7." (*Id.* at ¶¶ 40-45). According to Schirching, he did not credit the information provided by CS-7 to the extent that it was inconsistent with information provided from other sources because the information provided by

¶¶ 14-39, 46-49). In addition, Schirching's affidavit outlined evidence seized from Vanelli's residence in 2005; information obtained from jailhouse recordings of conversations between Boon and her imprisoned husband James H. McAuley ("McAuley") in 2007; evidence seized from the execution of a search warrant at 288 Benton Street in 2008; evidence obtained from various seizures that occurred in 2008 and 2009; evidence obtained pursuant to a controlled purchase conducted by CS-6 in 2010; information obtained pursuant to a pen register and trap and trace on the target number; and, information obtained from a pole camera located outside of Vanelli's residence. (*Id.* at ¶¶ 50-92).

According to Schirching, information from RS, CS-2 and CS-5 revealed that McAuley and an individual named Joseph B. Thomson ("Thomson") had traveled to California to obtain quantities of methamphetamine from an individual named Richard Mar ("Mar"), the president of a west coast chapter of the Hell's Angels. (*Id.* at ¶¶ 9(p), 15 (c), 24(a)). McAuley and Thomson transported the methamphetamine to Rochester, and Thomson handled the distribution of the methamphetamine. (*Id.*). According to RS, McAuley and Thomson supplied Vanelli with methamphetamine. (*Id.*). RS indicated that in October 2008 the members of the drug trafficking operation became nervous because Thomson had been arrested by the FBI and charged with various narcotics and firearms offenses. (*Id.* at ¶ 15(a) & n.11).

With respect to Boon, the investigation revealed that she took over her husband McAuley's methamphetamine operations when McAuley was imprisoned in 2007. (*Id.* at ¶¶ 9(d), 38 (a)). According to Schirching, CS-5 informed the task force that Boon began

---

CS-7 had not been corroborated and CS-7 had made various inconsistent and untruthful statements to investigators. (*Id.* at ¶ 45).

operating McAuley's methamphetamine operation when McAuley went to jail. (*Id.* at ¶ 38(a)). CS-5 stated that Boon supplied Vanelli with methamphetamine. (*Id.*). According to CS-5, Boon obtained methamphetamine monthly from a contact on the west coast who shipped it to a post office in Oakfield, New York – although the task force was unable to confirm that the post office had received any packages from California. (*Id.* at ¶ 38(a) and n.26). According to CS-5, in approximately 2007 or 2008, Gordon Montgomery ("Montgomery") traveled to California to meet the Hell's Angels member who would be supplying the methamphetamine. (*Id.* at ¶ 38(d)). According to CS-5, Montgomery brought a quantity of methamphetamine back to Rochester, although he was uncomfortable flying with the narcotics and decided that it would be safer to mail the narcotics. (*Id.*).

   In addition, CS-1 informed the task force that on July 3, 2008 he obtained a quarter gram of methamphetamine from Boon in exchange for performing some work for her. (*Id.* at ¶ 19(d)). CS-1 provided the substance to the task force. (*Id.*). According to CS-1, Boon repeatedly informed him that she could supply him with methamphetamine whenever he needed it. (*Id.*).

   Schirching's affidavit also recounted the substance of jailhouse telephone recordings of conversations between Boon and McAuley. (*Id.* at ¶¶ 52-64). According to Schirching, during a conversation in April 2007, Boon informed McAuley that Thomson had told her that he would no longer take orders from McAuley. (*Id.* at ¶ 53). McAuley responded that he had written to Thomson and had told him that he was still the "king" and that Thomson would have to work with his "queen," a term Schirching believed referred to Boon. (*Id.*).

In addition, according to Schirching, conversations between Boon and McAuley in early-May 2007 revealed that Montgomery traveled to California and returned with methamphetamine, which Boon provided to Vanelli. (*Id.* at ¶¶ 54-57). Schirching contends that this information was corroborated by CS-5's statements that Montgomery had traveled to California and by records subpoenaed from Airlines Reporting Company indicating that Montgomery flew from Buffalo, New York to San Jose, California on May 10, 2007 and returned on May 12, 2007. (*Id.* at ¶¶ 55-56).

Schirching described the contents of additional phone recordings of conversations between Boon and McAuley that occurred in late-May 2007 and early-June 2007 that concerned Boon and McAuley's involvement in planning Montgomery's travel to California in June 2007. (*Id.* at ¶¶ 60-63). According to Schirching, subpoenaed records indicated that Montgomery flew from Buffalo, New York to San Jose, California on June 1, 2007 and returned on June 3, 2007. (*Id.* at ¶ 64).

Finally, according to Schirching, the pen register for the target number indicated that the number either was used to contact a mobile telephone number associated with Boon or was contacted by that telephone number approximately 3,735 times between January 1, 2007 and April 18, 2010. (*Id.* at ¶ 92(b)). According to Schirching, the first recorded contact between the two numbers occurred on February 3, 2007, and the most recent contact occurred on April 17, 2010. (*Id.*).

**B.  May 21, 2010 Wiretap**

On May 21, 2010, Schirching applied for an extension of the eavesdropping warrant for the target number. (Schirching Aff. 2). In his affidavit, Schirching reiterated the

same goals for the investigation as he had identified in the previous warrant application. (*Id.* at ¶ 115). He also included descriptions of conversations that had been intercepted pursuant to the earlier wiretap order. (*Id.* at ¶¶ 14-99). In addition, Schirching's affidavit described a traffic stop conducted on May 7, 2010 involving two individuals, referred to as CS-8 and CS-9, who agreed to cooperate after the traffic stop. (*Id.* at ¶¶ 100-108). According to Schirching, on May 14, 2010, at the direction of the task force, CS-8 and CS-9 made a controlled purchase of methamphetamine from Vanelli. (*Id.* at ¶¶ 109-114).

With respect to Boon, Schirching's affidavit recounted several telephone conversations between Boon and Vanelli that were intercepted pursuant to the wiretap. (*Id.* at ¶¶ 49, 89). During the first conversation, which occurred on April 26, 2010 at approximately 6:25 p.m., Boon asked Vanelli to come to her house in order to help her with her "new basement." (*Id.* at ¶ 49). Subsequent physical surveillance revealed that Vanelli's vehicle arrived at Boon's residence at approximately 6:53 p.m. (*Id.*). According to Schirching, he believed that Vanelli went to Boon's residence to obtain a supply of methamphetamine. (*Id.*).

Schirching's affidavit asserted that the day before, on April 25, 2010, the target number received a phone call from Charles F. McAdam ("McAdam"), an alleged methamphetamine customer of Vanelli. (*Id.* at ¶¶ 9(f), 38). During the phone call, McAdam asked Vanelli if he could come to Vanelli's residence, and Vanelli responded that it "would be a wasted trip." (*Id.* at ¶ 38). Schirching believed that McAdam wanted to purchase methamphetamine from Vanelli and that Vanelli's response indicated that he did not have any methamphetamine to sell McAdam. (*Id.*). According to Schirching, at approximately 8:35 p.m. on April 26, 2010, after Vanelli's vehicle had been observed at Boon's residence, Vanelli placed

a call to McAdam from the target number.  (*Id.* at ¶ 50).  During that conversation, Vanelli told

McAdam that he was calling because McAdam had wanted Vanelli to call.  (*Id.*).  They agreed to

meet at Vanelli's residence in approximately twenty minutes.  (*Id.*).  According to Schirching,

physical and pole camera surveillance outside Vanelli's residence revealed that a vehicle

believed to be occupied by McAdam arrived at Vanelli's residence at approximately 9:01 p.m.

and left at approximately 9:30 p.m.  (*Id.*).  Schirching opined that Vanelli may have obtained

methamphetamine from Boon on April 26, 2010, which he then sold to McAdam.  (*Id.*).

        Schirching also recounted a telephone conversation that occurred between Boon

and Vanelli on May 8, 2010 at approximately 9:08 p.m.  (*Id.* at ¶ 89).  According to Schirching,

Boon called Vanelli and the two agreed to meet at her residence.  (*Id.*).  Physical surveillance

captured Vanelli's vehicle at Boon's residence shortly thereafter.  (*Id.*).  Schirching believed that

Vanelli may have obtained a quantity of methamphetamine from Boon during the visit.  (*Id.*).

### C.  June 18, 2010 Wiretap

        On June 18, 2010, Schirching applied for a second extension of the eavesdropping

warrant for the target number.  (Schirching Aff. 3).  In his affidavit, Schirching again identified

the same investigative goals.  (*Id.* at ¶ 106).  He also described additional conversations that had

been intercepted pursuant to the earlier wiretap orders.  (*Id.* at ¶¶ 15-101).  In addition,

Schirching's affidavit described another controlled purchase by CS-8 and CS-9 of

methamphetamine from Vanelli, this time on June 11, 2010.  (*Id.* at ¶¶ 102-105).

        With respect to Boon, Schirching described several phone calls between Boon and

Vanelli that had been intercepted over the wiretap.  (*Id.* at ¶¶ 35, 59, 73, 80).  For instance, on

May 28, 2010, Boon called Vanelli and asked to see him.  (*Id.* at ¶ 35).  Vanelli agreed to meet

Boon at her residence. (*Id.*). Based on his experience and the contents of other intercepted communications, Schirching believed that the purpose of the meeting was to discuss their drug distribution network, but that Vanelli did not obtain methamphetamine from Boon that day. (*Id.*).

A few days later, on June 4, 2010, Vanelli called Boon from the target phone number. (*Id.* at ¶ 59). According to Schirching, Boon asked Vanelli if he wanted to meet the following morning. (*Id.*). Vanelli responded in the affirmative. Schirching believed that the purpose of the call was to arrange a meeting to discuss their drug distribution network, but that the meeting ultimately did not occur. (*Id.*).

The following week, on June 11, 2010, at approximately 1:57 p.m., Vanelli called Boon and asked her to meet him at his residence. (*Id.* at ¶ 73). Based upon his experience and the content of other intercepted calls, Schirching believed that Vanelli arranged the meeting with Boon in order to supply her with methamphetamine or to discuss their ongoing drug distribution activities. (*Id.*). According to Schirching, Vanelli placed the phone call to Boon shortly after he returned to his own residence after meeting with an individual named David H. Cohen ("Cohen"). (*Id.*). Based upon his experience and review of other intercepted communications, Schirching believed that Vanelli obtained methamphetamine from Cohen during that meeting. (*Id.* at ¶¶ 71-72).

Later that same day, at approximately 6:42 p.m., Boon called Vanelli on the target number and asked where he was located. (*Id.* at ¶ 80). Vanelli responded that he was at his residence. (*Id.*). Boon then stated that she planned to arrive in a few minutes. (*Id.*). According to Schirching, pole camera surveillance showed Boon arriving at Vanelli's residence at

approximately 6:45 p.m., where she remained for about seven minutes. (*Id.*). Boon entered and exited the garage. (*Id.*). According to Schirching, the surveillance revealed that Vanelli may have handed something to Boon before she drove away. (*Id.*). Schirching believed that Boon went to Vanelli's residence in order to obtain methamphetamine from him and possibly to discuss their drug distribution activities. (*Id.*).

## II.  Search Warrant for 3658 Batavia Elba Townline Road

On July 8, 2010, Judge Larimer issued a warrant to search Boon's residence, 3658 Batavia Elba Townline Road, Oakfield, New York. (Docket # 277 at Ex. A ("Schirching Aff. 4")). Schirching's supporting affidavit incorporated by reference his wiretap affidavits discussed above and also sought authorization to search Vanelli's residence, a truck used by Vanelli and a safe deposit box owned by Boon.[6] (*Id.* at ¶¶ 3, 5-7). The search warrant authorized no-knock entry of Boon's residence at anytime of the day or night. (*Id.* at 1). In addition, it authorized the search and seizure of various items, but did not specifically authorize the search and seizure of computers. (*Id.* at 3).

Schirching's affidavit recounted information he had learned through his review of communications intercepted over the wiretaps. (*Id.* at ¶ 12). For instance, Schirching explained that intercepted communications led him to believe that Vanelli had obtained a quantity of methamphetamine from Boon at her residence on April 26, 2010. (*Id.*).

---

[6] Boon's challenge to the search warrant is limited to the probable cause supporting the authorization to search her residence and not her safe deposit box. (Docket # 277 at ¶ 35). Accordingly, only facts relating to probable cause to search Boon's residence are recounted herein.

Schirching's affidavit also described various communications intercepted after the date of the last wiretap order, including several phone calls intercepted over the target number between June 18, 2010 and June 21, 2010. (*Id.* at ¶¶ 12, 15-50). According to Schirching, in those calls, Vanelli repeatedly sought to obtain methamphetamine from an individual named Anthony Toscano ("Toscano"). (*Id.*).

On June 22, 2010, Vanelli received a phone call from his girlfriend. (*Id.* at ¶ 24). During that call, they discussed whether Vanelli had talked to Boon.[7] (*Id.*). The tenor of the communication, according to Schirching, suggested that Vanelli and Boon had had a dispute that resulted in Vanelli being unable to obtain methamphetamine from Boon. (*Id.*). According to Schirching, this dispute explained why Vanelli was attempting to obtain a supply from Toscano. (*Id.*).

On June 23, 2010, at approximately 9:43 a.m., Vanelli called Boon. (*Id.* at ¶ 26). During the conversation, Boon asked Vanelli to come to her residence that morning to check her "lawn mower." (*Id.*). Based upon his experience, Schirching believed that Boon was using coded language to ask Vanelli to come to her residence so that she could supply him with methamphetamine. (*Id.*). According to Schirching, pole camera surveillance captured Vanelli departing his residence later that morning at 11:19 a.m. (*Id.* at ¶ 27). Physical surveillance revealed Vanelli arriving at Boon's residence at approximately 11:57 a.m. (*Id.*). Schirching believed that Vanelli obtained methamphetamine from Boon during his visit to her residence. (*Id.*).

---

[7] Vanelli and Primus did not identify Boon by name. (*Id.*).

According to Schirching, the pole camera captured Vanelli returning to his residence at approximately 12:25 p.m. (*Id.*). Within minutes of his return, Vanelli placed two phone calls to suspected methamphetamine customers asking them to come to his residence. (*Id.* at ¶¶ 29-30). Shortly after those phone calls, Vanelli received a phone call from Primus. (*Id.* at ¶ 31). During the call, Primus stated that Vanelli "went back on [his] word." (*Id.*). Based on his experience and the other intercepted calls, Schirching interpreted Primus's statement to be an inquiry to Vanelli as to why he had changed his mind about obtaining methamphetamine from Boon. (*Id.*). Later that same day, at approximately 4:05 p.m., Vanelli received another phone call from Primus. (*Id.* at ¶ 33). According to Schirching, Vanelli and Primus had a dispute during the phone call. During the call, Primus, using expletives, stated "I don't . . . need her, but you do . . . you do need her." (*Id.*). According to Schirching, in this exchange, Primus was suggesting that Vanelli needed Boon to supply him with methamphetamine. (*Id.*).

## III. July 9, 2010 Arrest of Boon

This Court conducted an evidentiary hearing on December 7, 2012 concerning the circumstances surrounding Boon's arrest and statements she made following that arrest. (Docket # 338).[8] During the hearing, the government offered testimony from FBI Special Agent Matthew F. Giacobbei ("Giacobbei"). (Tr. 10-11).

### A. Testimony of Giacobbei

Giacobbei testified that he had been employed as an agent with the FBI for approximately eight years. (Tr.11). On July 9, 2010, Giacobbei was assigned to a drug

---

[8] The transcript of the December 7, 2012 hearing shall be referred to as "Tr. __." (Docket # 353).

trafficking investigation involving Boon. (Tr. 12). Specifically, at approximately 6:15 a.m. that morning, Giacobbei and approximately nine other law enforcement officers arrived at Boon's residence at Batavia Elba Townline Road in Oakfield, New York, to execute warrants authorizing Boon's arrest and a search of her residence. (Tr. 13-14, 43-44).

The entry team lined up with their guns drawn in a staggered line at Boon's front door. (Tr. 14-15, 44). Giacobbei testified that the officers at the front of the line knocked on the door and loudly announced their presence and that they had an arrest warrant. (Tr. 14, 44-45). According to Giacobbei, the officers at the front of the line reported hearing noises from inside the residence, and Giacobbei himself heard "rustling" noises. (Tr. 14, 42-43). At that point, the first two officers breached the door using a battering ram. (Tr. 14, 43).

Almost immediately, the officers encountered Boon who was wearing pajamas and appeared to have just awoken. (Tr. 15, 45). Boon was ordered to freeze and directed from the residence. (Tr. 16, 45). At that point, she was handcuffed and advised that she was under arrest. (Tr. 16). According to Giacobbei, although Boon initially appeared startled, she calmed down by the time she was escorted from the house and remained calm throughout the rest of her encounter with law enforcement. (Tr. 64-65).

Once Boon had been removed from the premises, the agents conducted a security sweep of the residence. (Tr. 16). During the sweep, the officers encountered two dogs. (Tr. 17). The first dog was removed from the residence and placed in a secure area without incident. (Tr. 17-18). The other dog became frightened and hid under a bed. (Tr. 17, 62). At the officers' request, Boon assisted them in calming the dog and removing it from the residence. (*Id.*). At that point, the dog was placed in a secure area while law enforcement completed the security

14

sweep.  (Tr. 17-18).  According to Giacobbei, he never overheard any officer threaten to shoot either of Boon's dogs.  (Tr. 39-40).

When the sweep was completed, at approximately 6:45 a.m., Boon was accompanied back inside her residence by a female officer and was permitted to change her clothes.  (Tr. 18, 57).  She was then placed, handcuffed, into the back of an unmarked police vehicle.  (Tr. 18-19, 52-53).  Giacobbei and Pete Welker ("Welker"), an investigator employed by the Genesee County Sheriff's Office, also got into the car.  (Tr. 18-19).  By that time, the officers had holstered their service weapons.  (Tr. 21).

Giacobbei testified that he explained to Boon why she was under arrest.  (Tr. 19).  Specifically, he informed her that he was involved in an ongoing investigation into drug trafficking activities involving both Boon and Vanelli.  (Tr. 19-20).  Giacobbei explained that the investigation had involved the use of a wiretap to record phone conversations, including conversations in which Boon had participated.  (*Id.*).  According to Giacobbei, he identified a particular phone conversation between Boon and Vanelli and then played a recording of the call for Boon to hear.  (*Id.*).  Giacobbei testified that he played the call once and Boon did not ask any questions or make any statements about it.  (Tr. 20-21, 52-57).

After playing the recording, Giacobbei explained to Boon that she would be taken to the Genesee County Sheriff's Office, and Welker then drove Boon and Giacobbei to the Genesee County Sheriff's Office.  (Tr. 22, 57-58).  During the ride, the officers did not discuss the case with Boon, although they may have engaged in small talk.  (Tr. 25).  They arrived at approximately 7:31 a.m.  (Tr. 22-23).

Once they arrived at the sheriff's office, Boon's handcuffs were removed and she was offered something to drink and allowed to use the restroom.  (Tr. 23, 60-61).  She was taken to a conference room and, at approximately 7:50 a.m., Giacobbei reminded Boon that she was under arrest and then read the *Miranda* warnings verbatim from a *Miranda* rights form.  (Tr. 24-26, 58; Government's Exhibit ("G. Ex.") 1).  After reading the entire form aloud, Giacobbei provided the form to Boon, asked her to read it and instructed her to sign it if she agreed with everything contained on the form.[9]  (Tr. 26).  Giacobbei testified that Boon reviewed the form for approximately twenty to thirty seconds and, without asking any questions, signed the form with the name "Donna McAuley."  (Tr. 26-27, 30; G. Ex. 1).  At that point, Giacobbei and Welker signed the form as witnesses, and Giacobbei recorded the time, 7:51 a.m.  (Tr. 27; G. Ex. 1).

After Boon executed the form, the officers began to interview her.  (Tr. 30).  The interview lasted approximately four hours and concluded at approximately 11:52 a.m.  (Tr. 40).

---

[9]  The "Advice of Rights" form provided:

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.
>
> I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present.

(G. Ex. 1).

According to Giacobbei, Boon responded to their questions and remained calm throughout the questioning. (Tr. 30-31). Giacobbei testified that during the entire interview, Boon appeared to understand the questions, did not appear to be under the influence of any drugs or alcohol and never asked for an attorney or invoked her right to remain silent. (Tr. 30-31, 40). She did, however, repeatedly express concern about her two dogs. (Tr. 39, 61-62). Giacobbei responded that the officers would arrange care for the dogs and, at Boon's request, contacted an individual named Wendy and asked her to care for the dogs. (Tr. 39). Giacobbei testified that during the interview, he never promised Boon that she would be permitted to return to her dogs. (Tr. 40).

During the interview, Giacobbei remained in contact with the search team at Boon's residence and was informed that the team had discovered computers and digital media at the residence. (Tr. 31). Giacobbei asked Boon for her consent to allow the team to seize, copy and search those items. (Tr. 32). According to Giacobbei, he initially obtained a verbal consent from Boon by explaining to her that the items had been found and asking her whether law enforcement could review the items. (Tr. 32-33). According to Giacobbei, at approximately 10:26 a.m., Boon provided verbal consent to search the computers and the digital media. (Tr. 33).

At some point during the interview, after her verbal consent had been obtained, Giacobbei also obtained Boon's written consent for the search of the computers and digital media on a written consent to search form. (*Id.*). After filling in the pertinent information, including make, model and serial numbers for the computers and media, he read the form to Boon,

omitting the serial numbers that he had filled in on the form.[10]  (Tr. 33-34, 37-38; G. Ex. 2).  He

then handed the form to Boon and asked her to review and sign the form.  (Tr. 35).  Giacobbei

testified that Boon reviewed the form, signed it with the name "Donna McAuley" and dated it.

(Tr. 35, 38).  Giacobbei signed the form as a witness.  (Tr. 36, 38).

### B.  Boon's Affidavit

In support of her suppression motion, Boon submitted an affidavit stating that she

was taken into custody by state and federal law enforcement personnel on the morning of July 9,

2010, at approximately 6:00 a.m.  (Docket # 322 at ¶ 2).  Boon contends that she had only

approximately two to three hours of sleep and was not given any coffee.  (*Id.* at ¶¶ 19-21).

According to her affidavit, Boon was confronted by law enforcement personnel in her kitchen.

(*Id.* at ¶¶ 4-5).  According to Boon, the officers were yelling and screaming and her dog hid

---

[10]  The "Consent to Search" form provided:

> 1.  I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of:
>
>> - HP Pavillion laptop (Black)
>>   Serial number -CNF7434f1x
>>
>> - Gateway laptop (Black)
>>   Serial number - 1uwcx0b0060150b4511601
>>
>> - Compac presario desktop (Black tower)
>>   Serial number - mxm3280rx5
>>
>> - Various SD cards & thumbdrives
>
> 2.  I have been advised of my right to refuse consent.
>
> 3.  I give this permission voluntarily.
>
> 4.  I authorize these agents to take any items which they determine may be related to their investigation.

(G. Ex. 2).

under her bed. (*Id.* at ¶¶ 6-8). Boon stated that one of the officers threatened to shoot the dog, but Boon interceded and the dog was secured without injury. (*Id.* at ¶¶ 9-10).

According to Boon, she was handcuffed and placed in a police vehicle. (*Id.* at ¶¶ 7, 10). While in the vehicle, the agents confronted her with tape recorded telephone conversations and repeatedly told her, "We got you" or "We got these." (*Id.* at ¶¶ 12-13). Boon stated that she was subsequently taken to the sheriff's office and provided an "Advice of Rights" form. (*Id.* at ¶¶ 14-15). According to Boon, although she was able to read and write English, she did not understand her rights or what the document said. (*Id.*). Boon stated that the officers told her that she would be permitted to return home to her dogs if she told them what they wanted to hear. (*Id.* at ¶¶ 16, 22).

In her affidavit, Boon also contends that although she was asked to consent to the search of her computers, SD cards and thumb drives, she was not verbally advised of her right to refuse consent. (*Id.* at ¶¶ 17-18).

## DECISION & ORDER

### I. Bill of Particulars

I turn first to Boon's motion for a bill of particulars. (Docket # 277 at ¶¶ 101-02). Boon seeks additional particularization regarding the charges against her, including whether she is alleged to be a principal or an accomplice, whether the conspiracy involved pure narcotics or a mixture, the weight of the narcotics at issue and the precise date that the narcotics conspiracy commenced. (*Id.* at ¶ 101). The government opposes the motion on the grounds that Boon has

sufficient knowledge and understanding of the charges, as well as access to substantial voluntary discovery, to make her request unnecessary. (Docket # 302 at 35-39).

During oral argument on October 25, 2012, the Court instructed the government to review the information Boon had requested and to inform the Court whether the government could provide any of the information sought by Boon. The Court also instructed Boon's counsel to advise whether, in light of any disclosures made by the government, she still needed more particularization.

A review of the docket and case file suggests that this has not occurred, although the parties may have communicated and resolved the issues without informing the Court. To the extent the parties have not resolved this dispute, the Court instructs them to confer in good faith by **December 20, 2013** regarding the alleged particularization desired by Boon. In the event that the parties are unable to resolve any remaining disputes, Boon may file an additional motion seeking relief from this Court by no later than **January 10, 2014**.

On this record, given the narrow purpose of a bill of particulars, I conclude that Boon's pending, broad-ranging demand for information is not warranted, and I deny her request for a bill of particulars at this time without prejudice to renewal. *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (*per curiam*) (purpose of bill of particulars is to enable defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense").

# REPORT & RECOMMENDATION

## I. Motion to Suppress Wiretap Evidence

### A. Standing

18 U.S.C. § 2510(11) defines an "aggrieved person" as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). According to the Second Circuit, a person "who has had his conversations intercepted during the wiretap" is an aggrieved person. *United States v. Fury*, 554 F.2d 522, 525 (2d Cir.), *cert. denied*, 433 U.S. 910 (1977). Under 18 U.S.C. § 2518(10), an aggrieved person may "move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a). The record plainly demonstrates, and the government does not dispute, that Boon has standing to move to suppress telephone conversations intercepted over the target phone.

### B. Other Investigative Procedures

Boon seeks suppression of the intercepted communications on the grounds that the supporting affidavits offered by Schirching failed to demonstrate that before resorting to the use of wiretaps, traditional investigative procedures had been attempted and had proved unsuccessful. In other words, according to Boon, Schirching's affidavit failed to justify the need for wiretap interception. (Docket # 277 at ¶¶ 62-80).

21

An application for a wiretap authorization must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). A judge may approve a wiretap application only after determining that such a showing has been made. 18 U.S.C. § 2518(3)(c). This requirement "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). In other words, the government need not "exhaust all conceivable investigative techniques before resorting to electronic surveillance," but must resort to telephonic surveillance only "when it is necessary to assist in law enforcement." *United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009); *United States v. Funderburk*, 492 F. Supp. 2d 223, 242 (W.D.N.Y. 2007) (the "other investigative procedures" requirement is not intended to turn electronic surveillance into a "tool of last resort"). "'Merely because a normal investigative technique is theoretically possible, it does not follow that is likely' to succeed." *United States v. Crosby*, 2010 WL 4703615, *3 (W.D.N.Y.) (quoting *United States v. Torres*, 901 F.2d 205, 231-32 (2d Cir. 1990), *abrogated on other grounds as recognized by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010)), *report and recommendation adopted*, 2010 WL 4703596 (W.D.N.Y. 2010). The wiretap application needs only to inform the issuing court "of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *United States v. Concepcion*, 579 F.3d at 218 (internal quotation omitted).

In narcotics conspiracy investigations, this requirement may be satisfied by "describing how traditional investigative techniques had failed to provide more than a 'limited

picture' of [the] narcotics organization." *United States v. Valdez*, 1991 WL 41590, *2 (S.D.N.Y.) (quoting *United States v. Torres*, 901 F.2d at 232), *aff'd*, 952 F.2d 394 (2d Cir. 1991). Moreover, wiretaps are particularly appropriate when "the telephone is routinely relied on to conduct the criminal enterprise under investigation." *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987) (internal quotation omitted).

This Court's review of the issuing court's determination is not *de novo*; rather, the reviewing court must determine only whether "the facts set forth in the application were minimally adequate to support the determination that was made." *Concepcion*, 579 F.3d at 218 (quoting *United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997) (agent's assertion that surveillance had been conducted unsuccessfully on numerous occasions was "minimally adequate"), *cert. denied*, 524 U.S. 905 (1998)); *see also United States v. Miranda*, 1993 WL 410507, *2 (S.D.N.Y. 1993) (issuing court's determination concerning sufficiency of normal investigative techniques is entitled to "substantial deference"). The reviewing court must test the application in a "practical and commonsense fashion." *Concepcion*, 579 F.3d at 218.

Applying a practical, commonsense and deferential review to the instant case, I find that Schirching's affidavits were at least minimally adequate to support a finding that further use of traditional investigative techniques appeared unlikely to succeed. In his affidavits, Schirching identified the purpose of the investigation as the identification of the customers and co-conspirators involved in the methamphetamine distribution, the sources of the methamphetamine, the transaction times and locations of the methamphetamine distributions and acquisitions, as well as the storage locations for the methamphetamine. (Schirching Aff. 1 at ¶ 94; Schirching Aff. 2 at ¶ 115; Schirching Aff. 3 at ¶ 106). He further stated that the goal of

23

the investigation was not limited to gathering evidence to prosecute the identified interceptees and violators, but included identifying unknown co-conspirators and "completely dismantl[ing] th[e] drug distribution network." (Schirching Aff. 1 at ¶ 94(a)).

Schirching further affirmed that although "normal investigative techniques" had produced evidence of the existence of an "ongoing illegal narcotics distribution network," those investigative techniques had not accomplished and were not likely to accomplish the objectives of the investigation. (Schirching Aff. 3 at ¶ 107). For example, although the investigation had developed evidence against Vanelli and some of his associates, the investigation had not yielded information sufficient to identify all the members of the organization, including its suppliers, or to reveal the method of drug distribution, the means of financing, the locations where the drugs, proceeds and related records were stored, or the location or method of disposing of the drug proceeds. (*Id.* at ¶ 109).

Boon challenges the necessity of the wiretaps, contending that traditional investigative means would have succeeded in achieving the objectives of the investigation. (Docket # 277). For instance, Boon contends that the use of confidential sources had resulted in controlled purchases from Vanelli. (*Id.* at ¶ 66). According to Schirching's affidavit, however, several of the sources either were no longer cooperating with the task force or were unable to proactively cooperate. (Schirching Aff. 3 at ¶¶ 110-11). Further, several of the confidential sources refused to participate in controlled purchases or to provide testimony for fear of retaliation. (*Id.* at ¶¶ 112-13). In addition, according to Schirching, due to the nature of the organizations involved, including their awareness of law enforcement's investigative techniques, the participants in the drug distribution network typically interacted with a limited number of

trusted individuals and the confidential sources simply did not and would not be able to identify other co-conspirators or to explain their roles in the drug distribution network. (*Id.* at ¶ 114). Finally, Schirching affirmed that although two confidential sources (CS-8 and CS-9) had conducted controlled purchases from Vanelli on two separate occasions, those sources did not have any knowledge about Vanelli's suppliers and could not identify them. (*Id.* at ¶ 115).

Boon also contends that the task force's use of traffic stops was successful in obtaining the cooperation of two confidential informants, CS-8 and CS-9. (Docket # 277 at ¶ 67). In his affidavit, Schirching confirmed that a traffic stop of CS-8 and CS-9 yielded the seizure of methamphetamine and the cooperation of those two sources. (Schirching Aff. 3 at ¶ 133). As discussed above, however, although CS-8 and CS-9 had been able to conduct controlled purchases from Vanelli, they were unable to obtain information relating to his suppliers. (*Id.* at ¶ 134). In addition, according to Schirching, the use of additional traffic stops risked jeopardizing the investigation by alerting Vanelli to the particular investigative efforts of the task force. (*Id.*).

Next, Boon contends that the use of a pole camera outside of the Vanelli residence was successful in obtaining information that the task force utilized in obtaining search warrants. (Docket # 277 at ¶ 68). The affidavit in support of the search warrant, however, specifically relied upon the content of conversations occurring over the target telephone, in addition to surveillance evidence obtained from the pole camera. (*Id.* at Ex. A at ¶¶ 12, 15-26, 28-43, 47-50). Accordingly, although evidence obtained from the pole camera was relied upon in securing the search warrants, a substantial amount of the information submitted in the search warrant affidavit was obtained pursuant to the wiretaps.

In any event, Schirching explained in detail why the pole camera could not provide sufficient information to allow the task force to achieve its objectives. (Schirching Aff. 3 at ¶¶ 124-30). According to Schirching, although the pole camera helped identify several suspected members of the drug distribution network, its effectiveness was limited. (*Id.* at ¶ 124). For example, although the pole camera could capture evidence of a meeting at Vanelli's residence, it could not reveal the purpose of the meeting or the roles of the participants. (*Id.* at ¶¶ 126-27). The pole camera also had a limited ability to capture activities occurring at night, as well as activities in the garage, where a majority of meetings took place. (*Id.*).

Schirching's affidavit also explained that the use of physical surveillance could jeopardize the investigation. (*Id.* at ¶ 125). According to Schirching, Vanelli's residence was located in a rural area, where extensive physical surveillance posed a substantial risk of detection. Indeed, according to Schirching, intercepted communications suggested that Vanelli had been alerted to the presence of law enforcement in the vicinity of his residence. (*Id.* at ¶ 128). Similarly, Moran's residence and the Hell's Angels clubhouse were both located on Algonquin Terrace in the City of Rochester. (*Id.* at ¶ 125). According to Schirching, Algonquin Terrace is a dead end street and approximately nine of the houses on the street were owned by members or associates of the Hell's Angels. (*Id.*). Thus, Schirching explained, physical surveillance on that street was also unlikely to succeed. (*Id.*).

Boon also suggests in conclusory terms that law enforcement successfully used other investigative techniques, including mail covers, pen registers, garbage pulls, the execution of search warrants and previous wiretaps. (Docket # 277 at ¶¶ 64, 69, 71, 73). Schirching's affidavit addressed each of these investigative techniques and explained in depth why use of

those techniques would not have produced the information the task force needed and could have potentially jeopardized the ongoing investigation. (Schirching Aff. 3 at ¶¶ 131-32, 135-36, 137-38, 139-40). Finally, Boon contends that the task force successfully obtained jailhouse recordings of conversations between McAuley and Boon. (Docket # 277 at ¶¶ 70, 75). As Schirching explained, those recordings were useful to corroborate information provided by confidential sources, but were limited in their usefulness in part because McAuley indicated that he was conveying information through the mail. (Schirching Aff. 3 at ¶ 141).

This Court is satisfied that Schirching adequately explained why traditional investigative methods risked jeopardizing the investigation and were unlikely to succeed. For these reasons, and applying the legal standards described above, I reject Boon's arguments that the wiretap orders are invalid because law enforcement did not exhaust other traditional investigative techniques. *See Concepcion*, 579 F.3d at 218, 219 (law enforcement need not exhaust "all conceivable investigative techniques"; fact that "leads could have been better leveraged before resorting to a wiretap" does not mandate suppression where affidavit was otherwise "minimally adequate"); *United States v. Mitchell*, 2010 WL 55927, *5 (W.D.N.Y. 2010) (affidavits were sufficient where they asserted that informants and surveillance provided only "a limited picture of the drug distribution network"). In the three affidavits, Schirching sufficiently identified the traditional investigative techniques that had been utilized and adequately informed the issuing court why other techniques were unlikely to achieve the aims of the investigation. Accordingly, I recommend that Boon's motion to suppress the wiretap communications based upon the alleged failure to demonstrate the futility of other investigative techniques should be denied.

## II.  Validity of Search Warrant for 3658 Batavia Elba Townline Road

Next, I address Boon's challenge to the July 8, 2010 search warrant for 3658 Batavia Elba Townline Road on the grounds that the application failed to establish probable cause.  (Docket # 277 at ¶¶ 31-61).  Specifically, Boon argues that the intercepted conversations between herself and Vanelli recounted in Schirching's affidavits were not criminal in nature and did not demonstrate probable cause to believe that methamphetamine would be found at her residence  (*Id*. at ¶¶ 37-41).  According to Boon, Schirching merely speculated that her requests that Vanelli visit her residence to look at her "new basement" and to inspect her "lawn mower" were related to drug trafficking operations.  (*Id*.).  Boon maintains that she has receipts reflecting plumbing and lawn mower-related repairs made in August 2009, January 2010 and May 2010. (*Id*. at ¶ 42).  According to Boon, these receipts suggest that she had recently had work completed on both her basement and her lawn mower and that her requests to Vanelli related to those projects.  (*Id*. ¶ 43).

Further, Boon maintains that the confidential sources were unreliable.  (*Id*. at ¶¶ 56-58).  In addition, Boon contends that the fact that the execution of the search warrant at her residence did not result in the seizure of any narcotics underscores the absence of probable cause supporting the warrant.  (*Id*. at ¶ 50).  Finally, Boon maintains that the no-knock authorization was unjustified because she had no criminal history and had previously been ordered to surrender all of her firearms.  (*Id*. at ¶ 61).

### A.  Probable Cause

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the

place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV; *see also* Fed. R. Crim. P. 41. In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court affirmed the "totality of the circumstances" test to determine whether a search warrant satisfies the Fourth Amendment's probable cause requirement. According to the Court, the issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. at 238. A reviewing court's obligation is merely to determine that the issuing judge had a "'substantial basis for...conclud[ing]' that probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 238-39) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate"). Moreover, "resolution of doubtful or marginal cases should be largely determined by the preference to be afforded to warrants." *United States v. Smith*, 9 F.3d at 1012 (citing *Jones v. United States*, 362 U.S. 257, 270 (1960)).

Taken together, Schirching's affidavit, which incorporated his earlier wiretap affidavits, provided sufficient probable cause to believe that evidence of a methamphetamine trafficking network would be found at Boon's residence. Schirching's affidavits described information provided by three confidential sources, each of whom stated that Boon distributed methamphetamine. One of the sources indicated that Boon took over her husband's methamphetamine distribution operation when he was incarcerated in 2007. That informant further indicated that Boon obtained the methamphetamine from the west coast and that

Montgomery had traveled to the west coast to obtain a quantity of methamphetamine. That information was corroborated by communications between McAuley and Boon which described arrangements for Montgomery to travel to California, as well as by airline records reflecting his flights to California during the time period.

The same source informed the task force that Boon supplied Vanelli with methamphetamine. Intercepted communications and pole camera and physical surveillance captured Vanelli at Boon's residence on April 26, 2010, May 8, 2010 and June 23, 2010. After returning from the April and June visits, intercepted communications captured Vanelli placing phone calls to suspected methamphetamine customers to ask them to come to his residence. In addition, the affidavits recounted two successful controlled purchases of methamphetamine from Vanelli and information from a confidential source who indicated that Boon had provided the source with methamphetamine. Although some of the intercepted communications appear cryptic, this evidence, considered together, provided sufficient probable cause to believe that evidence relating to a methamphetamine conspiracy would be found at Boon's residence. *United States v. Fury*, 554 F.2d at 530-31 (probable cause shown where ambiguous statements could be "reasonably interpreted to indicate what the detective interpreted them to be" when considered in context of defendant's criminal record and ongoing investigation); *see also United States v. Cancelmo*, 64 F.3d 804, 808 (2d Cir. 1995) (observing that "drug dealers rarely speak openly about their trade" and that use of "narcotics code" may support probable cause finding). Nor does the fact that Boon has receipts for plumbing and lawn mower repairs undercut a finding of probable cause. *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) ("fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause").

In any event, Boon has failed to offer any evidence to suggest that the searching officers did not rely upon the warrant in good faith. *See United States v. Leon*, 468 U.S. 897 (1984); *United States v. Cancelmo*, 64 F.3d at 807 (applying good faith exception to exclusionary rule where search warrant application relied on ambiguous coded conversations). No credible evidence exists that the issuing judge was knowingly misled or wholly abandoned his judicial role. *See United States v. Leon*, 468 U.S. at 923. Nor was the warrant so facially deficient or so lacking in probable cause that reliance upon it would have been unreasonable. *See id.*; *Cancelmo*, 64 F.3d at 807 (citations omitted). Accordingly, I recommend that Boon's motion to suppress evidence seized from 3658 Batavia Elba Townline Road be denied.

## B. No-Knock Authorization

Boon also seeks to suppress the evidence seized during the execution of the search warrant at 3658 Batavia Elba Townline Road on the grounds that Schirching's affidavit did not support the issuance of a no-knock warrant. (Docket # 277 at ¶ 61). As an initial matter, Giacobbei's testimony, which I credit, establishes that law enforcement knocked and announced their presence before breaching Boon's door. (Tr. 14, 42). In any event, "both the Supreme Court and the Second Circuit have clearly stated that the exclusionary rule does not apply to any evidence seized as a result of a violation of either the Fourth Amendment 'knock and announce' rule or 18 U.S.C. § 3109." *United States v. Cooper*, 2011 WL 6180035, *4 (D. Vt. 2011) (citing *Hudson v. Michigan*, 547 U.S. 586, 594 (2006) and *United States v. Acosta*, 502 F.3d 54, 61 (2d Cir. 2007)); *United States v. Ling Zhen Hu*, 2010 WL 4451532, *5 (W.D.N.Y. 2010) ("even if there had been a violation of the knock-and-announce rule, that would not provide a basis for

suppressing evidence"). Accordingly, it is my recommendation that Boon's motion to suppress

evidence seized pursuant to the no-knock warrant be denied.

## III. <u>Motion to Suppress Statements</u>

Next, I turn to Boon's motion to suppress statements she made on July 9, 2010, on

the grounds that she did not knowingly and voluntarily waive her *Miranda* rights before being

questioned.[11]  (Docket # 367).

Statements made during custodial interrogation are generally inadmissible unless

a suspect first has been advised of her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436

(1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's

statements that are the product of custodial interrogation unless it demonstrates that the

defendant was first warned of his Fifth Amendment privilege against self-incrimination and then

voluntarily waived that right.  *Miranda v. Arizona*, 384 U.S. at 444.  Accordingly, "[e]ven absent

the accused's invocation of [his rights], the accused's statement during a custodial interrogation

is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and

voluntarily waived [*Miranda*] rights when making the statement."  *United States v. Plugh*, 648

F.3d 118, 127 (2d Cir. 2011) (alteration in original) (quoting *Berghuis v. Thompkins*, 560 U.S.

370, 382 (2010)), *cert. denied*, 132 S. Ct. 1610 (2012).  To establish a valid waiver, the

government must prove by a preponderance of the evidence that (1) the waiver was "knowing" –

---

[11]  To the extent that Boon contends that her *Miranda* waiver was limited to verbal statements or that she invoked her *Miranda* rights for purposes of making a written statement, I conclude that such contentions are unavailing.  (Docket # 367 at 5).  First, there is nothing in the record to suggest that Boon's waiver was limited or that she invoked any of her rights.  Second, Boon did not provide a written statement and the fact that Giacobbei took notes that he later transcribed into a 302 report is irrelevant to the analysis.

namely, that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," and (2) it was "voluntary" – namely, "that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Id.* at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003 (1993). In evaluating the totality of the circumstances, the court must assess: "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials." *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 131 S. Ct. 969 (2011). Where circumstances suggest evidence of "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation," statements will be deemed involuntary. *United States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 954 (2011)), *cert. denied*, 133 S. Ct. 48 (2012).

Here, the government does not contest that Boon was in custody at the time that she made the statements in question. Rather, the question is whether Boon was advised of and validly waived her *Miranda* rights prior to providing the statements. On the record before me, principally the testimony of Giacobbei, which I credit, I find that Boon was properly advised of

her *Miranda* rights and voluntarily waived them before speaking to the investigators.[12] Specifically, Giacobbei testified that when they arrived at the sheriff's office, he read aloud to Boon the entire *Miranda* form, including the *Miranda* warnings and the statements at the end of the form, asked Boon to review the form and then to sign the it. Although Giacobbei did not expressly ask Boon whether she agreed to waive her rights, the form contained a statement indicating that by signing the form the signatory was agreeing to answer questions without a lawyer present.[13] Giacobbei further testified that Boon reviewed the form, signed it and then responded to his questions. I conclude that Boon's conduct constituted a waiver of her *Miranda* rights. *United States v. Plugh*, 648 F.3d at 127 (finding waiver where defendant ultimately signed a "waiver-of-rights" form and subsequently chose to speak with custodial agents).

Although Boon was not read the *Miranda* rights until approximately one and a half hours after being taken into custody, she did not provide any statements to law enforcement until after she had been advised of her rights. Boon showed no signs of intoxication or illness during the interview, nor did she request an attorney or that the questioning cease. I further find that Giacobbei did not threaten or make any promises, such as an agreement to allow Boon to return to her dogs, in order to induce Boon to speak.

Although the officers' entry into Boon's home may have been intimidating, those circumstances, without more, do not render her waiver and subsequent statements involuntary.

---

[12] The government urges the Court to reject Boon's affidavit in its entirety on the grounds that Boon did not testify during the suppression hearing. (Docket # 378 at 9-10). I find it unnecessary to reach that question because I reject Boon's statements to the extent they are inconsistent with Giacobbei's testimony, which I have evaluated and credit.

[13] Specifically, the form provides: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." (G. Ex. 1).

*See United States v. Henderson*, 2013 WL 5839805, *5 (W.D.N.Y.) (citing *United States v. Laidlaw*, 2010 WL 382551, *6 (D. Conn. 2010) ("[a]lthough being arrested by officers who have their weapons drawn is intimidating, 'the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness'") (quoting *United States v. Snype*, 441 F.3d 119, 131 (2d Cir.), *cert. denied*, 549 U.S. 923 (2006))), *report and recommendation adopted*, 2013 WL 6191524 (W.D.N.Y. 2013). After the entry, the officers holstered their weapons, Boon was permitted to change her clothes and was transported to the sheriff's office. At the sheriff's office, Boon was allowed to use the restroom and offered a drink. Boon's interview was conducted by Giacobbei and Welker and was preceded by administration of *Miranda* warnings. On this record, I conclude that Boon's waiver of her *Miranda* rights was voluntary. *See United States v. Phillips*, 2009 WL 1918931, *2-3 (N.D. W. Va. 2009) (statement and consent were voluntary where "any guns which were drawn had been holstered well prior to the interview, the accused had been moved to a police car with only three officers present, and the surprise of the arrest had somewhat dissipated").

Although Boon contends that she had only approximately two to three hours of sleep, Giacobbei testified that she appeared to understand and responded appropriately to his questions. Further, nothing in the record indicates that Boon expressed fatigue or a desire to sleep or end the interview. *See Colon v. Ercole*, 2010 WL 9401, *38 (S.D.N.Y.) (statements voluntary where "[t]here is no suggestion that Colon felt any fatigue or expressed a desire to end the interview or sleep"), *report and recommendation adopted*, 2010 WL 3767079 (S.D.N.Y. 2010); *Zapata v. Greene*, 2005 WL 1521186, * 11 (E.D.N.Y. 2005) (sleep deprivation is "but one factor that must be viewed in combination with all the others" in determining the

voluntariness of the confession); *United States v. Guzman*, 11 F. Supp. 2d 292, 298 (S.D.N.Y.) ("there is no evidence to suggest that the defendant expressed any fatigue he felt or that he indicated the desire to end the interrogation[;] . . . [a]bsent such evidence, [the Court] cannot conclude that continuing the interview until the morning offended due process or deprived [defendant] of his free will"), *aff'd*, 152 F.3d 921 (2d Cir. 1998); *see also United States v. Mitchell*, 2013 WL 5300687, *5 (N.D. Tx. 2013) ("despite [d]efendant asserting that his fatigue, overall physical condition, and hunger prevented him from making a voluntary waiver of his *Miranda* rights, there is nothing in the record to indicate that [d]efendant requested additional time to rest or requested food, that the [d]efendant complained about his condition, or that the officers conditioned additional rest time or food on receiving a confession"). On this record, I conclude that Boon's waiver and subsequent statements to law enforcement were voluntary and I recommend that the district court deny Boon's motion to suppress the statements she made on July 9, 2010.

## IV.   Motion to Suppress Computer Evidence

I now turn to Boon's motion to suppress the computer and digital media evidence seized from Boon's residence on July 9, 2010. (Docket # 367 at 5-7). Because the search was conducted without a warrant, its legality turns on whether Boon voluntarily consented to the search. *See Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (*per curiam*) (citing *California v. Carney*, 471 U.S. 386, 390-91 (1985)).

It is well-established that a warrantless search is permissible if based upon the valid consent of a person authorized to provide consent. *Schneckloth v. Bustamonte*, 412 U.S.

218, 222 (1973); *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995), *cert. denied*, 516 U.S.

1050 (1996). The consent need only be voluntary, that is, obtained without coercion, even if it

was given without knowledge of the right to refuse consent. *See Schneckloth v. Bustamonte*, 412

U.S. at 248-49; *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).

Voluntariness is determined based upon the totality of the circumstances.

*Schneckloth*, 412 U.S. at 227; *United States v. Hernandez*, 5 F.3d 628, 632 (2d Cir. 1993);

*United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990). Among the relevant

considerations are age, education, background, physical and mental condition, the setting in

which the consent is obtained, whether *Miranda* warnings are administered and whether the

individual has knowledge of the right to refuse consent. *See Schneckloth*, 412 U.S. at 226;

*United States v. Kon Yu-Leung*, 910 F.2d at 41. "Consent must be a product of that individual's

free and unconstrained choice, rather than a mere acquiescence in a show of authority," *United*

*States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (citations omitted), *cert. denied*, 511 U.S. 1130

(1994), and the fact that it is obtained while the individual is in custody does not render it

involuntary, *see*, *e.g.*, *United States v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir. 1988), although

it does "require more careful scrutiny," *United States v. Wiener*, 534 F.2d 15, 17 (2d Cir.), *cert.*

*denied*, 429 U.S. 820 (1976).

The government bears the burden of establishing by a preponderance of the

evidence that the consent was voluntary. *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir.

2004); *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir.), *cert. denied*, 454 U.S. 830

(1981). "The ultimate question presented is whether the officer had a reasonable basis for

believing that there had been consent to the search." *United States v. Isiofia*, 370 F.3d at 231 (internal quotations and citations omitted).

Considering the totality of the circumstances, I find that Boon's consent to the search of her computers and digital media was voluntary. Her consent to search was obtained during the post-*Miranda* interrogation described above, which lasted approximately four hours. In addition to advising her of her *Miranda* rights, Giacobbei also explained and read the consent form to Boon. The form precisely identified the items to be searched and stated that the consent was voluntary and that Boon had been informed of her right to refuse consent. Giacobbei testified that Boon was calm and responsive during her interactions with law enforcement. Under such circumstances, I conclude that Boon's consent to the search was voluntary. *See United States v. Young*, 2012 WL 5245305, *5 (W.D.N.Y. 2012) (citing *United States v. Crespo*, 834 F.2d 267, 269-71 (2d Cir. 1987) (holding consent voluntary even when made after officers displayed guns, arrested and handcuffed defendant), *cert. denied*, 485 U.S. 1007 (1988)), *report and recommendation adopted*, 2013 WL 6154411 (W.D.N.Y. 2013).

I reject Boon's contention that the length of the interview somehow rendered her consent involuntary. I also disagree with her suggestion that any failure to advise her that the search warrant did not specifically authorize a computer search invalidated her consent. Finally, I reject Boon's contention that Giacobbei's testimony regarding her consent is unreliable because he could not recall the exact time that he obtained her written consent to the search. Accordingly, I recommend that the district court deny Boon's motion to suppress the computers and digital evidence seized from Boon's residence on July 9, 2010.

## CONCLUSION

Boon's motion for a bill of particulars is **(Docket # 277)** is **DENIED without prejudice** to renewal by no later than **January 10, 2014**. In addition, Boon's request to withdraw her motion seeking suppression of the jailhouse recordings **(Docket # 367)** is **GRANTED**. For the reasons stated above, I recommend that the district court deny Boon's motions to suppress wiretap evidence, statements and tangible evidence. (Docket # 277).

**IT IS SO ORDERED.**


_____s/Marian W. Payson_____
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
        December __12__, 2013

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

    **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

    **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[14]

    The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

    <u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u> *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

    The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

    Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                  *s/Marian W. Payson*
                                  MARIAN W. PAYSON
                              United States Magistrate Judge

Dated: Rochester, New York
       December   12  , 2013

---

[14] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).